CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY
v.
HENRY FLORENS.

*Railroads—Injury to Team—Crossings—Rate of Speed of Train in
Absence of Regulation by Ordinance—Contributory Negligence—Failure
to Look and Listen.*

1. In the absence of legislation or municipal regulation a railroad may
adopt such rate of speed for its trains as it deems advisable, providing it is
reasonably safe to passengers being transported.

2. It is not the duty of an engine-driver, on nearing a crossing, to stop
his train for the purpose of avoiding a collision with a team he may see
approaching.

3. In an action to recover from a railroad company for injuries inflicted
upon a team at a highway crossing, this court holds that the defendant was
not guilty of negligence in the premises, but that the plaintiff was negli-
gent in failing to look for trains before driving upon the track.

[Opinion filed February 14, 1890.]

APPEAL from the Circuit Court of Fulton County; the Hon.
J. C. BAGBY, Judge, presiding.

Messrs. O. F. PRICE and FREDERICK M. GRANT, for appel-
lant.

Mr. H. W. MASTERS, for appellee.

WALL, J. The appellee recovered a judgment against the
appellant for $110 for injuries inflicted upon his team in a
collision with an engine running upon the railroad of appel-
lant.

The plaintiff was engaged in hauling coal in wagons and
had occasion to cross the railroad at a point where, by reason
of the up grade of the wagon road, it was necessary to double
teams. He had thus taken one wagon over the crossing and
while going over with the second, the train came along and
collided with the team, killing two mules, and doing some

damage to the wagon and harness. It appears that by reason of the peculiar situation as to embankments, etc., a train coming from that direction could be seen but a short distance by one standing on the track; but that, standing a few feet west of the track, it could be seen for three quarters of a mile or more. Plaintiff claims that he made an observation with the purpose to see whether a train was coming but a few moments before attempting to cross with the second wagon. He could neither see nor hear anything of the sort at that time, and he does not state that he made any further observation. It was a stormy day, cloudy and windy, with some snow. Plaintiff heard no signals until just as the train was upon him. There is no evidence that the usual signals were not given, nor that any one who was listening, or might have heard them if given, did not hear them. Incidentally two witnesses who were on the train speak of hearing the whistle sounded just before the collision, which was all the plaintiff heard.

On the part of appellant five witnesses—all trainmen—testified that the whistle was sounded for the crossing at the proper place, one-fourth of a mile before reaching it, and it also appears that the bell, which was of more than thirty pounds weight, was rung by steam from the time of leaving the last station, about two miles. It may therefore be said there is no question that the bell was rung, and upon the evidence there can scarcely be any question that the whistle was sounded, as required by law, before the train reached the crossing. Hence, the plaintiff must recover, if at all, upon the allegation found in the first count of his declaration, that the engine and train were carelessly and negligently driven and managed, thereby causing the collision. Upon this allegation the plaintiff seems to rely, and it was prominently presented to the jury in the instructions given by the court at his instance. In support of this allegation proof was offered as to the speed of the train. Two witnesses who were riding in the caboose (it was a freight train) testified that the speed was extraordinary, thirty-five or forty miles per hour, as they supposed.

It appears that the train ran a considerable distance, possibly a half mile, according to plaintiff's estimate, beyond the crossing before it stopped. It then backed up to the crossing. There was a down grade at the place. The trainmen put the speed at eighteen or twenty miles per hour, and say that it was a down grade; that it was usual to apply the brake on the rear car before starting down the hill, and that it was done on that occasion, and that as soon as the team was discovered going, or about to go, on the track, the stock alarm was sounded and every effort was made to avoid a collision. As there was a bridge and an embankment just beyond the crossing, it is difficult to believe that the engineer and fireman would neglect anything in their power to avert the evident risk of a collision at a place of such danger.

The whole case is thus narrowed down to the speed of the train and the measure of negligence that may be predicated thereon. According to the estimates of the various witnesses the speed was somewhere between eighteen and forty miles per hour. There was no legal provision regulating the rate of speed at that place.

As was said by the Supreme Court in C., B. & Q. R. R. Co. v. Lee, 68 Ill. 582, "There is nothing in the charter of the company nor in the general laws of the State, which imposes any restraint as to the speed its trains may run.

"Where not prohibited by municipal regulations it is apprehended the company may adopt such rate of speed as it shall deem advisable, provided always it is reasonably safe to the passengers being transported. It will be subject to no liability for the rate adopted if not otherwise at fault."

To the same effect see W., St. L. & P. Ry. v. Neukirk, 13 Ill. App. 387; Same v. Same, 15 Ill. App. 172. If it be said if the train had been running at a lower rate of speed it could have been stopped in time to prevent the accident, we think the answer is that whether going at the highest or lowest estimated rate it would have been impossible to have stopped after the team was discovered to be in danger.

In C., B. & Q. R. R. Co. v. Damrell, 81 Ill. 453, the Supreme Court remark: "This court has frequently asserted

the doctrine that it is not the duty of the engine driver on nearing a road crossing to stop his train for the purpose of avoiding a collision with a wagon and team he may see approaching the crossing." Hence there would have been no duty to stop or attempt to stop until the team was seen to be going on the track and in danger, and if, when it so appeared, no possible effort would be sufficient to stop and avoid the collision, then there would be no negligence in that respect.

We are unable to see how the rate of speed, if too great, can be regarded as the proximate cause of the accident. Again it is difficult to see how the plaintiff can be considered as in the exercise of ordinary care. It was a crossing of more than ordinary danger because an approaching train could not readily be seen from every portion at or near the track though, as already stated, by slight effort it was possible to get a view up the track for at least three quarters of a mile, and while the plaintiff said he had recently made an observation he had not done so just before he attempted to cross.

Since making that observation he had gone to the wagon and in attaching the extra team thereto he had been delayed by a difficulty in adjusting the connection so that some appreciable time, no one knows how long, had elapsed before starting to cross. That lapse of time was certainly more than enough to enable a train going at any ordinary speed to cover the space of track which was visible from any attainable point. Common prudence would have required that he again look before attempting to cross the track, going up hill with a heavily loaded wagon drawn by four horses. It was certainly within his power to have been perfectly safe and no reasonable excuse appears for his omission to protect himself by again looking and being sure that no train was near. It was his duty to do so. Upon this point see C., B. & Q. R. R. Co. v. Damrell, *supra*, and the numerous cases there cited where the omission of such precaution is on the facts then in proof declared to be gross negligence.

We think, under all the conditions here in proof and in view of the plaintiff's familiarity with the location and danger, such omission was highly negligent in this instance. After

making all due allowances for the weight to be given to the verdict we feel constrained to say that the evidence clearly fails to show negligence on the part of the defendant and ordinary care on the part of the plaintiff. It is not a conflict of evidence, but a want of evidence in these particulars. The judgment will be reversed and the cause remanded.

*Reversed and remanded.*